FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

MAR 1 2 2010

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| A. STEPHAN BOTES, | :: | CIVIL ACTION NO. |
| BOP Reg. # 56403-019, | :: | 1:08-CV-01341-CAM |
| Plaintiff, | :: | |
| | :: | |
| v. | :: | |
| | :: | |
| HOWARD J. WEINTRAUB, | :: | FEDERAL DIVERSITY ACTION |
| Defendant. | :: | 28 U.S.C. § 1332 |

## ORDER AND OPINION

Now before the Court are Plaintiff A. Stephen Botes's motion to compel disclosure and discovery sanctions [75] and Defendant Howard J. Weintraub's responses [78, 83]; Weintraub's motion for summary judgment [77], with supporting brief [77-2] and affidavits [77-4, 77-5], as corrected [80, 81]; Botes's response [87], with supporting affidavits [89, 90], and motion to waive the rule on page limits [86]; Weintraub's reply [93] and motions for time to file same [91] and to strike [95] his initial reply; Botes's sur-response [98] and motion for time to file same [96]; and Botes's motion for summary judgment [97], Weintraub's response [94], and Botes's reply [99], inadvertently docketed also as a motion to strike.

In this federal diversity civil action, Botes sues Weintraub, one of his defense attorneys in <u>United States v. Botes</u>, No. 1:04-cr-568-3-CC (N.D. Ga. Sept. 13, 2006)

(resulting in the 97-month term of imprisonment Botes is now serving), aff'd, 290 F. App'x 316 (11th Cir. 2008), cert. denied, 130 S. Ct. 55 (2009), for breach of contract and fraud under the laws of Georgia, this Court having dismissed Botes's claims alleging violations of federal law. (See Compl. [1] at 26-28; Order [34] at 6-14 (setting forth the relevant factual allegations in Botes's complaint, id. at 1-6, which the Court elaborates upon as needed in the remainder of this Order).) Botes seeks compensation for financial loss in excess of $75,000 and for "stress, pain, anxiety and suffering" resulting from Weintraub's alleged violations of Georgia law. (Compl. at 26-29.)

## I. Summary Judgment Standard and Procedures

Summary judgment is proper if the pleadings and other documents on file "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). When considering a summary judgment motion, a court must "view the evidence and all factual inferences therefrom in the light most favorable" to the non-movant. Burton v. City of Belle Glade, 178 F.3d 1175, 1187

2

(11th Cir. 1999). "A court need not permit a case to go to a jury, however, when the inferences that are drawn from the evidence, and upon which the non-movant relies, are implausible." Cuesta v. School Bd. of Miami-Dade County, 285 F.3d 962, 970 (11th Cir. 2002) (internal quotations omitted). Morever, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal quotations omitted).

The movant bears the initial burden of demonstrating that summary judgment is warranted. Apcoa, Inc. v. Fidelity Nat'l Bank, 906 F.2d 610, 611 (11th Cir. 1990). The movant may do so by showing "that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325. Once the movant has properly supported the summary judgment motion, the non-movant then must "come forward with specific facts showing that there is a *genuine issue for trial,*" i.e., that the evidence is sufficient to support a jury verdict in the non-movant's favor. Bailey v. Allgas, Inc., 284 F.3d 1237, 1243 (11th Cir. 2002) (internal quotations omitted). See

3

also Chanel, Inc. v. Italian Activewear of Fla., Inc., 931 F.2d 1472, 1477 (11th Cir. 1991) (stating that "non-moving party must come forward with *significant, probative evidence*") (emphasis added). "[C]onclusory assertions . . . [without] supporting evidence are insufficient to withstand summary judgment." Holifield v. Reno, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997).

A motion for summary judgment may be supported or opposed with "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any." Fed. R. Civ. P. 56(c). "As a general rule, the court may consider on a Rule 56 summary judgment motion any material that would be admissible or usable at trial." Property Mgmt. & Invs., Inc. v. Lewis, 752 F.2d 599, 604 n.4 (11th Cir. 1985) (assuming without deciding "that authenticity and completeness are among the evidentiary requirements of Rule 56"). See also Rowell v. BellSouth Corp., 433 F.3d 794, 800 (11th Cir. 2005) (stating that court "may consider only . . . evidence [that] can be reduced to an admissible form," and noting that "evidence that is otherwise admissible may be accepted in an inadmissible form at summary judgment stage," and that, although hearsay generally cannot "be reduced to admissible form," statement of party's agent or servant may be admissible under Fed. R. Evid. 801(d)(2)(D) as admission of party-opponent); Woods v. City of

4

<u>Chicago</u>, 234 F.3d 979, 987-88 (7th Cir. 2000) (stating that Rule 56(e) "does not *require* that all supporting material be submitted in affidavit form,"[1] and that "court may consider any material that would be admissible or usable at trial, including properly authenticated and admissible documents or exhibits") (citation and internal quotations omitted).

## II. Discussion

### A.    Facts

Unless otherwise indicated, the following facts are undisputed. Botes was arrested on November 5, 2004, and was first indicted by a grand jury sitting in the Northern District of Georgia on November 10. <u>See</u> Docket Sheet, <u>Botes</u>, No. 1:04-cr-568-3-CC. Weintraub interviewed Botes on November 5, after his arrest, and again, at length, on November 6, at the Atlanta City Detention Center. Botes hired Weintraub to represent him through his trial and sentencing, if necessary, and the representation agreement between the two was memorialized on February 2, 2005.

---

[1] An affidavit "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence," and may be supported by "[s]worn or certified copies" of documents referred to in the affidavit. Fed. R. Civ. P. 56(e). An "unsworn declaration, certificate, verification, or statement" may be used in the place of a sworn affidavit to support or oppose a motion for summary judgment if the declaration "is subscribed by [the declarant], as true under penalty of perjury, and dated." <u>See</u> 28 U.S.C. § 1746.

5

(See Pl.'s 1st Counter-Aff. [89] ¶¶ 3, 44-45.) Botes was released from pretrial custody on November 9, under a set of conditions to which he objected, through Weintraub, with substantial success for the duration of his pretrial release. See Docket Sheet, Botes, No. 1:04-cr-568-3-CC. Weintraub arranged for Botes to take two polygraph examinations, but Weintraub was unsuccessful in his attempts to have the results admitted for use at Botes's trial.

On January 10, 2006, Brian Steel entered an appearance as Weintraub's co-counsel. On February 15, 2006, Weintraub telephoned Botes informing him that he was withdrawing as Botes's counsel, and he confirmed his intent to withdraw via a letter to Botes on the same day. On March 17, 2006, Weintraub filed a motion to withdraw from his representation of Botes, and the Hon. Clarence Cooper of this Court, presiding over Botes's criminal trial, granted the unopposed motion on April 11, 2006. On April 20, 2006, Daniel Griffin entered an appearance as Steel's co-counsel. See Docket Sheet, Botes, No. 1:04-cr-568-3-CC.

An unsigned version of the Representation Agreement between Botes and Weintraub, submitted by Weintraub and dated February 2, 2005, required Botes to pay Weintraub $100,000 on the condition that Botes's legal expenses were covered by his "Zurich insurance policy for" his criminal proceedings, and $65,000 if they were not.

AO 72A
(Rev.8/82)

(Def.'s Mot. Summ. J. Ex. 23 [77-29] at 3.) Botes contends that the February 2, 2005 representation agreement submitted by Weintraub does not reflect the fee agreement Botes and Weintraub reached on November 7, 2004, which did not include a $35,000 fee contingent upon Botes's receiving insurance payments. (Pl.'s 1st Counter-Aff. [89] ¶¶ 44-45.) However, Botes acknowledges that he "unilaterally" "changed his agreement for" Weintraub to include the additional $35,000 as an incentive when, "[i]n late January 2005, it was evident to Botes that Weintraub was not doing any investigation and not learning the case." Botes also acknowledges that the "agreement of November 7, 2004, was altered by the Representation Agreement signed February 2, 2005," and was further altered by Botes's and Weintraub's "agreement reached on February 6-7, 2006." (Id. ¶¶ 44-45; Pl.'s Opp'n Def.'s Mot. Summ. J. (hereinafter Pl.'s Opp'n) Ex. 104 ¶¶ b-d [87-3 at 37]; see id. Exs. 65, 70-72.)

By January 26, 2006, Weintraub had received $65,000 in legal fees, paid under Botes's insurance policy, but he had not received the remaining $35,000 that was due under the representation agreement. Accordingly, Weintraub inquired about those funds in an e-mail to Botes on that date. (Pl.'s Opp'n Ex. 65 at 2 [87-3 at 11].) On February 2, 2006, Botes responded to Weintraub via e-mail, offering him a choice between either (1) withdrawing from the case (stating that, if Weintraub did so, the

7

two would "see who owes who what," based on Weintraub's "'meticulously kept' record of hours spent"; Botes would thank him "for that which [he] did do well"; and the two would "shake hands and part company") or (2) "continue working on the case . . . with the understanding that [Botes was] not in the position to pay" him at that time. (Id. Ex. 65 at 1 [87-3 at 10].)

On February 3, 2006, Weintraub sent Botes an e-mail stating that he "remain[ed] steadfastly committed to . . . vigorously defending" Botes at trial and proving his innocence to a jury. (Id. Ex. 70 [87-3 at 12].) On February 8, 2006, Botes sent Weintraub an e-mail stating that he was "quite pleased that [they had] resolved all issues and that [Weintraub would] remain an integral part of the defense team." Botes thanked Weintraub for his "gracious offer that [Botes] retain that $35,000 and apply it to [his] other losses and cost of [his] defense, while [Weintraub] look[ed] forward to being part of the winning team and the positive publicity that will accompany it." (Id. Ex. 71.) Weintraub responded by e-mail on February 10, 2006, agreeing that Botes could "retain the $35,000 that [the] Zurich [insurance company] sent to [Botes] as [Weintraub's] fee," and noting that Botes had agreed that the roles Weintraub and Steel would play at Botes's trial would be decided between the two attorneys, without Botes's "interven[ing] in that decision process." (Id., Ex. 72.)

AO 72A
(Rev.8/82)

As subsequent events demonstrated, however, Weintraub withdrew from his representation of Botes via the email and letter he sent to Botes on February 15, 2006, and the motion to withdraw he filed on March 17, 2006 (see Def.'s Mot. Summ. J. Ex. 25 [77-31]), without an objection on the record from Botes. Weintraub telephoned Botes on February 15, 2006, and, according to Botes, informed Botes that he intended to withdraw "because he felt slighted by [the] *pro se* opening Botes had written in December 2004," when Botes believed his trial was imminent and that "Weintraub knew nothing of the case itself," and "because of Botes having allegedly told counsel for Zurich Insurance that Weintraub had been ineffective." (Pl.'s Opp'n Ex. 104 [87-3 at 37]; see id. Ex. 76 [87-3 at 18].) On February 18, 2006, Botes sent Weintraub an e-mail explaining that, if Weintraub "remain[ed] as counsel to handle the open issues with the polygraph until those issues have been satisfactorily disposed of and resolved," his "withdrawal [would] then be unopposed and [they could] *part without any further* financial obligation without regard to how much time [Weintraub] did or did not spend" on Botes's case. (Id. Ex. 43 [87-2 at 48].)

On March 17, 2006, Judge Cooper signed an Order, entered on March 20, adopting the Magistrate Judge's Report and Recommendation on the issue of Botes's polygraph examinations and excluding the examination results from use at his trial.

9

On April 25, 2006, jury selection began for Botes's trial. On May 24, 2006, the jury convicted Botes on (1) one count of conspiracy to defraud the State of Georgia and embezzle federal funds, (2) eleven counts of theft from programs receiving federal funds, and (3) three counts of wire fraud. Botes was acquitted on six counts of wire fraud, twenty-six counts of money laundering, and one count of structuring financial transactions. On September 13, 2006, Botes received a combined sentence of 97 months' imprisonment. See Superseding Indictment [76], Order [185], Trial Notes [196], Jury Verdict [247], & J. [286], Botes, No. 1:04-cr-568-3-CC.

Botes claims that he contacted Weintraub on June 27 and July 21, 2006, demanding compensation for Weintraub's alleged breach of contract, but Weintraub did not respond. (Compl. ¶¶ 167-68.) Weintraub's fee and the expenses of Botes's polygraph examinations were paid by Botes's insurer, Zurich International (see Def.'s Mot. Summ. J. Ex. 24 [77-30] at 6-8), although Botes claims that he ultimately is responsible for all of the expenses paid by Zurich in connection with his criminal proceedings.

## B. Botes's Fraud Claims

Under Georgia law, "[t]he five elements essential to a tort suit for damages resulting from a material misrepresentation constituting fraud are: (1) that the

10

defendant made the representations; (2) that at the time he knew they were false; (3) that he made them intending to deceive the plaintiff; (4) that the plaintiff justifiably relied on the representations; and (5) that the plaintiff sustained the alleged loss and damage as the proximate result of their having been made." Parrish v. Jackson W. Jones, P.C., 629 S.E.2d 468, 471 (Ga. Ct. App. 2006). Botes alleges that he "agreed to Weintraub's representation of him through trial, and in the unfortunate event of a conviction, through sentencing," based on Weintraub's claims that he was "professionally qualified to conduct Botes' defense"; "that he had eight years experience as an Assistant United States Attorney for the Northern District of Georgia; [and] that he had a special relationship and rapport with the judges and prosecutors in the District[, who] were his 'buddies.'" (Compl. ¶¶ 11-13.) Botes also alleges that "Weintraub represented to Botes that [Magistrate] Judge Alan Baverman [who handled the pretrial release matters in Botes's case] was a previous criminal Defense attorney [who] was [Weintraub's] 'buddy,'" and that Weintraub and Judge Cooper "were in law school together; that he sat next to 'Cooper' at a funeral of a judge; that Cooper called him 'Howard' in court . . . and that Cooper was going to let him have the run of the courtroom." (Id. ¶¶ 20, 62.) Botes alleges that these "fraudulent pretenses of [Weintraub's] 'friendship' with the prosecutors and judges [were] meant

11

to deceive Botes into not replacing him as counsel." (Id. ¶ 173.) Botes also alleges that Weintraub "defrauded [him] into taking polygraphs and incurring all the [associated] expenses . . ., purportedly for [the results] to be admiss[i]ble at trial, when [Weintraub] had no such intention from the outset, but only decided to do so after [Botes] had passed" the examinations. (Suppl. Pl.'s Initial Disclosures [51] ¶ 1(b).)

### 1.   Weintraub's Arguments in Support of Summary Judgment

Weintraub argues that Botes's fraudulent misrepresentation claims fail because he "made no false statements to Botes regarding his relationship with the judges or prosecutors in the Northern District, his professional experience, or the propriety of and procedure for moving to admit polygraph results." (Def.'s Br. Supp. Mot. Summ. J. (hereinafter Def.'s Br.) [77-2] at 4.) Weintraub contends that Botes's allegations of fraud do not meet the heightened pleading requirements of Fed. R. Civ. P. 9(b) because Botes "does not allege that any of the statements, if in fact made, were false or that harm resulted from Botes' reasonable reliance upon such alleged misrepresentation." (Id. at 7-9 (footnote omitted).) See Fed. R. Civ. P. 9(b) (providing that party "must state with particularity the circumstances constituting fraud," although state of mind "may be alleged generally"); Am. United Life Ins. Co. v.

AO 72A
(Rev.8/82)

Martinez, 480 F.3d 1043, 1064 (11th Cir. 2007) (affirming dismissal of fraud claim because plaintiff "presented only general conclusory allegations of fraud").

Weintraub argues further that even if Botes had pleaded fraud with sufficient particularity to avoid dismissal under Rule 9(b), Botes's claim that Weintraub misrepresented his relevant experience and "special relationship" with Judges Baverman and Cooper fails because it "is missing the first essential element; a false statement." (Def.'s Br. [77-2] at 10.) After listing his many professional credentials, including his tenure as an Assistant United States Attorney in the Northern District of Georgia from 1978 to 1985, Weintraub claims, based on the sworn testimony in his own affidavit, that he and Judge Cooper attended Emory Law School and that Judge Cooper has on occasion addressed him as "Howard." (Id. at 10-11.) Weintraub argues that his alleged suggestion to Botes that he "would have the run of [Judge Cooper's] courtroom" was "nothing more than" a promise or prediction, and his characterization of the quality of his relationships with federal judges and prosecutors was, even if accurately set forth by Botes, "subjective, incapable of proof by objective evidence." Weintraub argues that because neither statement was factual, neither statement can support a claim of fraud. (Id. at 11-12.)

13

With respect to the fourth element of a fraud claim under Georgia law, Botes's alleged reliance on his statements, Weintraub notes that Botes claims that those statements induced him both "'to <u>retain</u>'" Weintraub and "not to '<u>replace</u> him' as counsel." Weintraub argues that because Botes alleges he made the statements at issue after Botes already had retained him as counsel, Botes could not have relied upon them to "retain" him, negating Botes's claim in this regard. Weintraub also argues that Botes's alleged reliance on his statements is undermined by the entry of appearance on January 10, 2006, three months before Botes's trial began, of Brian Steel, who eventually replaced Weintraub as Botes's trial counsel. Weintraub notes that Steel had joined the defense team even earlier. (<u>Id.</u> at 12-13.)

Finally, Weintraub argues that Botes was not damaged by Weintraub's alleged misrepresentations because Weintraub achieved good results for Botes in the various motions he filed challenging the conditions of Botes's pretrial release, although he was unsuccessful in his attempt to secure the admission of the results of Botes's polygraph examinations. (<u>Id.</u> at 13.) Weintraub asserts that "Botes was convicted as the result of overwhelming evidence at trial against him, when Botes was represented by skilled trial counsel." (<u>Id.</u>) Accordingly, Weintraub argues, Botes cannot show that he was damaged by Weintraub's alleged misrepresentations. (<u>Id.</u> at 14.)

14

With respect to the polygraph examinations, Weintraub argues that Botes's fraud claim fails for the same reasons. First, Weintraub argues, "[t]here is no allegation that [he] made any false statement relating to the polygraph" examinations because he "would have had no reason to try to admit the results of a failed exam." (Id. at 14-15.) Moreover, Weintraub could not have known whether he would attempt to use the examinations until after Botes took and passed them, so that Weintraub had no "knowledge of falsity [or] intent to deceive," the second and third elements of a fraud claim under Georgia law. (Id. at 15.) Finally, Weintraub argues, Botes was not damaged by his failure to secure admission of the examination results because Botes did not testify at his trial, a precondition to the use of those results at trial. (Id. at 16.)

## 2.    Botes's Response

Botes responds that he originally retained Weintraub for a fee of $1,500 to represent him from his initial appearance through his bond hearing, and only later, after Weintraub made the alleged misrepresentations about his special relationships with the judges of the Northern District of Georgia, did Botes retain him through trial and, if needed, through sentencing, for a fee of $65,000. (Pl.'s Opp'n [87] at 16.) Botes argues that he pleaded fraud with sufficient particularity in his complaint, showing that he would not have hired Weintraub "but for [his] representations of his

15

being buddies with the judges and the prosecutors[;] . . . that [he] suffered the consequences of [Weintraub's] dereliction as a result of having hired him versus someone competent"; and "that Weintraub repeated his story of his buddies the judges when Botes threatened to replace him, so Botes would not." (Id. at 17.) Botes argues that he also showed that "Weintraub fraudulently represented to Botes that he . . . request[ed] Botes [to] take a polygraph to get it admitted into evidence at trial. . . . when Weintraub had never taken the care to ensure the [relevant] standards were met for evidentiary examinations, because Weintraub's [intent] was investigative," and he "knew that he was not having Botes do a polygraph for the purpose of its admission into evidence." (Id. at 17-18.) Finally, Botes claims that he has both pleaded and shown that Weintraub "under false pretenses withdr[ew] from representation, not representing Botes at trial as co-counsel, depriving Steel of being able to rely on Weintraub to make him aware of the things Weintraub had learned about the case that Steel was overlooking." (Id. at 19.)

### 3. Weintraub's Reply

Weintraub replies that Botes's allegations, even if true, do not create a genuine issue of *material* fact to support his claims of fraud. (Def.'s Reply Pl.'s Opp'n (hereinafter Def.'s Reply) [93] at 6-7.) Weintraub reiterates his contention that

AO 72A
(Rev.8/82)

nowhere in Botes's complaint or in his response to Weintraub's summary judgment motion does Botes present any evidence that Weintraub's alleged misrepresentations regarding his being "buddies" with federal judges and prosecutors or his having "the run of [Judge Cooper's] courtroom" were false. Moreover, Weintraub argues, even if false, these statements "amount[ed] to nothing more than opinions or predictions which do not support a claim for fraud." (Id. at 8.) Weintraub notes that there is "no evidence" that he ever claimed that his allegedly special relationships "would curry [Botes] a favorable result or rulings in the future or that the prosecution would in the future take or refrain from taking certain actions." (Id. at 9.)

With respect to Botes's claim regarding the polygraph examinations, Weintraub argues that "to the extent Botes claims that Weintraub purportedly handled the testing in a way that rendered the evidence inadmissible Botes is asserting a professional negligence claim, not fraud," for which summary judgment is proper because Botes has not submitted any expert testimony on that issue. (Id. at 10-11.) Finally, Weintraub notes that Botes asserts for the first time in response to his summary judgment motion a claim of "fraudulent withdrawal from representation." (Id. at 11.) Weintraub argues that, aside from Botes's failure to plead this claim properly, "there is no evidence that [his] withdrawal was fraudulent," in that he gave Botes proper notice of withdrawal

AO 72A
(Rev.8/82)

under Local Rule 83.1(E)(2); he served Botes with a copy of the Notice and Motion to Withdraw; Botes did not object to that motion; and the Court granted it. (<u>Id.</u> at 11-12.) Weintraub notes that Botes had two competent attorneys to represent him at trial, one of whom had entered his appearance in January 2006, months before Weintraub's withdrawal was approved and Botes's trial began, in April 2006. (<u>Id.</u> at 12.)

### 4. Botes's Sur-Response

Botes responds that it is "for a jury to decide if Weintraub's representations" fraudulently induced him to retain Weintraub initially and later. (Pl.'s Resp. Def.'s Reply (hereinafter Pl.'s Resp.) [98] at 6.) Botes argues that Weintraub admitted fraud regarding the polygraph by first claiming in his answer to Botes's complaint that he asked Botes to take the examination "with the intention of having it admitted at trial," and later swearing that "he only intended such after Botes had passed it." (<u>Id.</u>) Botes also argues that he did object to Weintraub's withdrawal under the circumstances in which he withdrew, without having completed all the work assigned to him; that he had anticipated that Weintraub would serve with Steel as co-counsel at his trial; and that he did rely on Weintraub "<u>not</u> withdrawing[,] to his detriment." (<u>Id.</u> at 7-8.)

18

## 5. Fraud – Law and Disposition

In a federal diversity lawsuit based on 28 U.S.C. § 1332 jurisdiction, as here, "state law governs substantive issues, while federal law governs pleading requirements." Brown v. Nichols, 8 F.3d 770, 773 (11th Cir. 1993) (citation omitted). As noted above, to succeed on a fraud claim under Georgia substantive law, a plaintiff must show that, to his detriment, he justifiably relied on knowingly false representations made by the defendant to deceive him. Parrish, 629 S.E.2d at 471. "While fraud may be proved by slight circumstances, it must amount to more than mere speculation." Clay v. Clay, 501 S.E.2d 208, 209 (Ga. 1998). "It is axiomatic that a false representation made by a defendant, to be actionable, must relate to an existing fact or a past event. Speculation, subjective opinions and unfulfilled hopes do not support a claim for fraud." Next Century Communs. Corp. v. Ellis, 171 F. Supp. 2d 1374, 1379-80 (N.D. Ga. 2001) (Thrash, J.) (granting motion to dismiss common law fraud claim brought under Georgia law in diversity case) (citation and internal quotations omitted), aff'd, 318 F.3d 1023 (11th Cir. 2003). "[A]ctions for fraud or misrepresentation must be based on objective statements of fact, not expressions of personal opinion. A statement of fact is one that (1) admits of being adjudged true or false in a way that (2) admits of empirical verification." Id. at 1380 (citation and

internal quotations omitted). Moreover, "a party cannot justifiably rely on a statement – as it must do in order to satisfy the fourth fraud element – that is not empirically verifiable, e.g., an expression of opinion or 'puffing.'" <u>Ellis</u>, 318 F.3d at 1027-28 & n.3 (quoting <u>GCA Strategic Inv. Fund, Ltd. v. Joseph Charles & Assocs., Inc.</u>, 537 S.E.2d 677, 682 (Ga. Ct. App. 2000), for propositions that, under Georgia law, "[m]isrepresentations are not actionable unless the complaining party was justified in relying thereon in the exercise of common prudence and diligence," and "a party is not justified in relying on and assuming to be true representations consisting of mere expressions of opinion, hope, expectation, puffing, and the like; rather, representations of this nature must be inquired into and examined to ascertain the truth"). "Fraud cannot consist of mere broken promises, unfilled predictions or erroneous conjecture as to future events." <u>Id.</u> at 1027. <u>See</u> <u>id.</u> at 1029 n.4 (noting "special knowledge" exception to rule that "reliance on puffing or mere expressions of opinion generally is unjustifiable as a matter of law," although exception does "not completely relieve[ the listener] of the obligation to investigate the veracity of the representation").

Based on the foregoing, it appears that none of the representations that Botes attributes to Weintraub – upon which Botes claims he justifiably relied, to his detriment, by retaining Weintraub as his counsel – rises to the level of actionable

AO 72A
(Rev.8/82)

fraud. At most, Botes has alleged that Weintraub engaged in puffing (regarding the nature of his relationships with the federal judges and prosecutors in the Northern District of Georgia), speculation (regarding the effect those relationships might have on the nature and/or outcome of Botes's criminal proceedings), and predictions of future events (such as Weintraub's alleged claims that he would "have the run" of Judge Cooper's courtroom, that he would seek the admission of the results of Botes's polygraph examinations without knowing whether the results were favorable to Botes, or that the results of those examinations would be admissible for use at Botes's trial). None of these allegedly fraudulent representations contained a statement about an existing, verifiable fact, upon which someone would be "justified in relying . . . in the exercise of common prudence and diligence," and, therefore, upon which a claim of fraud might be based. See Ellis, 318 F.3d at 1027-28.

In regard specifically to the polygraph examinations, Botes has alleged that Weintraub did not fulfill his promise to obtain admission of the results of those examinations, which, as noted above, is not actionable fraud. To the extent that Botes alleges that Weintraub fraudulently induced him to participate in polygraph examinations – to his detriment, based on Weintraub's alleged mishandling of those examinations, resulting in their inadmissibility – that claim is grounded in the

21

principles of legal malpractice, and it fails for the same reason that Botes's other legal malpractice claims fail, as set forth *infra*, in Section II. C. 6. a. of this Order. Finally, Botes's assertion of fraud with respect to Weintraub's withdrawal as his defense counsel is in fact an allegation that Weintraub, by claiming that Botes agreed to the withdrawal, has misrepresented the circumstances of his withdrawal to the Court in this civil action, rather than an allegation that Weintraub committed actionable fraud in 2006. Accordingly, the Court addresses Botes's claim regarding Weintraub's withdrawal from the representation agreement between the two under the rubric of Botes's breach of contract claim, as set forth below.

## C. Botes's Legal Malpractice/Breach of Contract Claims

### 1. The Elements of a Legal Malpractice Claim Under Georgia Law

Under Georgia law, "[i]n order to state a claim for legal malpractice, a plaintiff must establish three elements: '(1) employment of the defendant attorney, (2) failure of the attorney to exercise ordinary care, skill and diligence, and (3) that such negligence was the proximate cause of damage to the plaintiff.'" Brown v. Lewis, No. 4:08-CV-150, 2009 U.S. Dist. LEXIS 43776, at *33-34 (M.D. Ga. May 22, 2009) (quoting Duke Galish, L.L.C. v. Arnall Golden Gregory, L.L.P., 653 S.E.2d 791, 793 n.3 (Ga. Ct. App. 2007)). Section 9-11-9.1 of the Georgia Code requires that "[i]n any

22

action for damages alleging professional malpractice" against, among others, "[a]ttorneys at law," the plaintiff shall "file with the complaint an affidavit of an expert competent to testify, which affidavit shall set forth specifically at least one negligent act or omission claimed to exist and the factual basis for each such claim." O.C.G.A. § 9-11-9.1(a)(3), (g)(2). See Hopkinson v. Labovitz, 499 S.E.2d 338, 339 (Ga. Ct. App. 1998) (affirming dismissal of malpractice claims against defendant attorney, and noting "that plaintiff never filed the affidavit required pursuant to O.C.G.A. § 9-11-9.1 . . . and that to whatever extent plaintiff may seek to avoid the affidavit requirement on the basis that the alleged professional negligence is so 'clear and palpable' that it may be understood by a jury without expert evidence, this contention must yield to the mandatory direction contained in O.C.G.A. § 9-11-9.1"). "However, courts within this district have previously held that Georgia's expert affidavit requirement contained in O.C.G.A. § 9-11-9.1 [is a state procedural requirement that] does not apply in diversity actions filed in federal district courts." Denton v. United States, No. 1:04-CV-3285, 2006 U.S. Dist. LEXIS 9770, at *8 & n.4 (N.D. Ga. Feb. 15, 2006) (Vining, J.) (citing Baird v. Celis, 41 F. Supp. 2d 1358, 1360 (N.D. Ga. 1999) (Camp, J.), and noting that in Nichols, 8 F.3d at 774, Eleventh Circuit declined to reach "question of whether § 9-11-9.1 actually applies in federal court").

23

Nevertheless, "[t]o create an issue of fact concerning alleged legal malpractice, [the substantive law of] Georgia requires the testimony of an expert witness." Helmich v. Kennedy, 796 F.2d 1441, 1442-43 (11th Cir. 1986) (affirming grant of summary judgment, by district court sitting in diversity, to defendant attorneys on legal malpractice claim, because plaintiff "had not provided any expert testimony to support his allegations of malpractice and had failed to rebut the presumption the defendants performed their legal services in an ordinarily skillful manner"; rejecting plaintiff's attempt to rely on statements of fact in brief filed by his attorney in 28 U.S.C. § 2255 proceeding – alleging ineffective assistance of counsel by malpractice defendants during plaintiff's criminal trial – because those statements were "not in proper affidavit form," and, therefore, could not "be considered in determining if a genuine issue of material fact exist[ed]"; and citing Johnson v. Butcher, 301 S.E.2d 665, 666-67 (Ga. Ct. App. 1983), for proposition that "in a legal malpractice case, the presumption is that the legal services were performed in an ordinarily skillful manner[, and] remains with the attorney until [it] is rebutted by expert legal testimony; otherwise, the grant of summary judgment in favor of the attorney is proper"). But see Hughes v. Malone, 247 S.E.2d 107, 111 (Ga. Ct. App. 1978) (noting exception to

expert testimony requirement "in clear and palpable cases (such as the expiration of a statute of limitation)").

Moreover, "Georgia has adopted the doctrine of judgmental immunity, holding [that] the tactical decisions made during the course of litigation require, by their nature, that the attorney be given a great deal of discretion." Hudson v. Windholz, 416 S.E.2d 120, 124 (Ga. Ct. App. 1992) (internal quotations omitted).

> [T]here can be no liability for acts and omissions by an attorney in the conduct of litigation which are based on an honest exercise of professional judgment. This is a sound rule. Otherwise every losing litigant would be able to sue his attorney if he could find another attorney who was willing to second guess the decisions of the first attorney with the advantage of hindsight. If this were permitted, . . . the original trial would become a play within a play at the malpractice trial.

Id. (internal quotations omitted) (quoting Woodruff v. Tomlin, 616 F2d 924, 930 (6th Cir. 1980), "one of the seminal cases on judgmental immunity").

## 2. The Elements of a Breach of Contract Claim Under Georgia Law

"The elements [of] a breach of contract claim in Georgia are the (1) breach and the (2) resultant damages (3) to the party who has the right to complain about the contract being broken." Kuritzky v. Emory Univ., 669 S.E.2d 179, 181 (Ga. Ct. App. 2008). "[S]ubstantial compliance with the terms of the contract is all that the law requires." Id. "Parties may by mutual consent abandon a contract so as to make it not

AO 72A
(Rev.8/82)

*thereafter* binding." Day v. Fantastic Fitness, 378 S.E.2d 166, 167 (Ga. Ct. App. 1989). See Tokheim Corp. v. First Am. Bank, N.A., 424 S.E.2d 54, 56 (Ga. Ct. App. 1992) (affirming grant of summary judgment because non-movant's affidavit was "insufficient to create a genuine issue of material fact as to whether the contract was terminated by mutual consent of the parties," and noting that "record contains evidence which corroborates [movant's affidavit "stating that the contract was terminated by mutual consent"] by showing conduct of the parties subsequent to the mutual termination which is consistent with the facts asserted in the affidavit").

### 3.    Weintraub's Arguments in Support of Summary Judgment

Although Botes asserts that he seeks relief for Weintraub's "breach of contract below standard performance for fourteen of eighteen months leading up to Botes' trial, hamper[ing] the preparation of Botes' defense," Weintraub contends that Botes actually is claiming that Weintraub is liable for legal malpractice. (Def.'s Br. [77-2] at 16-17 (quoting Compl. ¶ 171).) Weintraub argues that "each and every claim in [Botes's] complaint is based upon an alleged breach of duty by Weintraub [arising] solely from his alleged failure to provide, under the employment contract, proper legal representation," which "is very clearly a claim of professional negligence." (Id. at 18.) Weintraub contends that Botes's failure "to produce any expert legal testimony" to

demonstrate Weintraub's alleged professional malpractice means that there is "no question of material fact . . . to be presented to a jury," and this "lack of material evidence is case-dispositive." (Id. at 19-20.) Weintraub argues, moreover, that his own affidavit [77-5] and the affidavit [77-4] of another expert in the field of criminal defense, Jerome J. Froelich, Jr., establish "the standard of care" by which his actions are to be measured and show that the "standard was met in [Botes's criminal] case." (Def.'s Br. at 21-23.) Weintraub also argues that all of his tactical decisions are protected by the judgmental immunity that applies to such decisions "made during the course of litigation in the good faith exercise of professional judgment." (Id. at 23-24.) Finally, Weintraub argues that Botes can not establish that he was damaged by Weintraub's alleged negligence, i.e., that but for Weintraub's alleged lethargy and inattention, Botes would have obtained "pretrial release without any conditions"; or that but for Weintraub's failure to order the polygraph examinations to be videotaped, the results of those examinations would have been admitted for use at Botes's trial; or that but for all of Weintraub's pretrial errors, including his failure to prepare properly to defend Botes, i.e., to interview defense witnesses, review discovery documents, and the like, Botes would not have been convicted despite "an abundance of incriminating evidence, including tape recordings of Botes." (Id. at 24-25.)

27

### 4.    Botes's Response

Botes responds that Weintraub breached his contract with Botes in the following ways, among others: (1) not preparing for trial, (2) not investigating the case, (3) not interviewing witnesses, (4) allowing Botes to suffer under unwarranted and unconstitutional pretrial release conditions, (5) abandoning matters entrusted to him, (6) deceiving Botes into taking a polygraph and "wasting 220 hours on futile attempts at getting the results [admitted] . . . and not spending that time learning the case or preparing for trial," (7) producing to the government, without challenge, evidence to be used against Botes, (8) telling Botes that his pretrial release conditions were standard and "not to waste his time" trying to obtain the least restrictive conditions, when Botes's persistence resulted in multiple beneficial changes to those conditions, (9) failing to file a motion for a speedy trial, and (10) surreptitiously withdrawing before trial without having interviewed one of Botes's witnesses, without having reviewed the bulk of the discovery documents Botes requested him to review, and before handling, to a satisfactory conclusion, the motion to admit the polygraph examinations. (Pl.'s Opp'n [87] at 25-29.)

28

### 5. Weintraub's Reply and Botes's Sur-Response

Weintraub replies that Botes's failure "to come forward with any expert testimony to rebut" the presumption that "an attorney performs legal services in an ordinarily skillful manner" is fatal to Botes's legal malpractice claims. (Def.'s Reply [93] at 3-4.) Botes responds that under the federal rules that govern this civil action he need not submit the affidavit of an expert regarding the applicable standard of care because a "lay person is competent to determine whether [an] attorney was negligent." (Pl.'s Resp. [98] at 3.) Botes also argues that his breach of contract claims are not suitable for summary judgment because, among other things, "the threshold question that needs to be decided by a jury is whether [Weintraub's] actions were indeed honest and in good faith, and, if not, no judgmental immunity could shelter him from liability." (Id. at 5.)

### 6. Analysis and Disposition

#### a. Legal Malpractice

As noted above, a plaintiff may not proceed in a federal diversity action on a legal malpractice claim under the substantive law of Georgia without providing an affidavit or other sworn testimony from a legal expert to support his claim. See OFS Fitel, LLC v. Epstein, 549 F.3d 1344, 1357 & n.8 (11th Cir. 2008) (concluding that

29

order "excluding plaintiff's legal expert was case-dispositive [under Georgia law in federal diversity action] because it foreclosed [plaintiff] from presenting the expert testimony required to prove professional negligence, which was a core element in all of [plaintiff's] claims," including "unjust enrichment and breach of fiduciary duty claims," which "incorporate[d] the allegations of legal malpractice without adding any independent factual allegations," and "expressly allege[d] that [defendant counsel] was unjustly enriched by receiving compensation for 'defective, unskillful, and harmful legal advice'"). The Court finds that, except for Botes's claim regarding Weintraub's complete withdrawal from Botes's defense team, addressed below, all of Botes's breach of contract claims – alleging that Weintraub's performance was substandard under his representation agreement with Botes – are in fact legal malpractice claims, for which Botes has offered no expert testimony regarding the standard of "ordinary care, skill and diligence" that Weintraub allegedly violated. See Lewis, 2009 U.S. Dist. LEXIS 43776, at *33-34. Moreover, the Court also finds that none of Botes's legal malpractice claims alleges a violation of the standard of care so "clear and palpable" as to constitute an exception under Georgia law to the expert testimony requirement. See Malone, 247 S.E.2d at 111. Accordingly, Weintraub is entitled to summary judgment on Botes's legal malpractice claims, despite Botes's

30

attempt to characterize them as breach of contract claims. See Epstein, 549 F.3d at 1357-58.

### b.     Breach of Contract

As noted above, Botes also has alleged that Weintraub breached the February 2005 representation agreement between the two when he withdrew as counsel shortly before the start of Botes's trial, despite having agreed to represent Botes "during trial" and "during a sentencing proceeding," if necessary. (See Def.'s Mot. Summ. J. Ex. 23 [77-29] at 3-5 (Representation Agreement).) Although Weintraub argues that Botes's breach of contract claim is really a disguised legal malpractice claim, the Court disagrees, at least with respect to the question of Weintraub's complete withdrawal from his representation agreement with Botes, rather than the question of his performance under that agreement, which the Court agrees involves only issues of legal malpractice, as set forth above.

However, based on the facts set forth *supra*, in Section II. A. of this Order, there does not appear to be a genuine issue of disputed material fact regarding the representation agreement into which Botes and Weintraub entered in February 2005 – requiring Botes to pay Weintraub a fee of $100,000 and Weintraub to represent Botes through trial and sentencing, if necessary – and which they abandoned by

31

mutual consent in February 2006 – at which time Weintraub agreed to reduce his fee to $65,000 and Botes agreed to allow Weintraub to withdraw, prior to trial, from his position as Brian Steel's co-counsel, provided that the outstanding issues regarding the polygraph examinations had been resolved. See Tokheim Corp., 424 S.E.2d at 56 (discussing abandonment by mutual consent); Fantastic Fitness, 378 S.E.2d at 167 (same). (See also Pl.'s Opp'n Ex. 43 [87-2 at 48] (Feb. 18, 2006 e-mail from Botes to Weintraub); Pl.'s 1st Counter-Aff. [89] ¶ 45.) On March 17, 2006, Judge Cooper signed an order overruling Weintraub's December 6, 2005 objections to the Magistrate Judge's recommendation that the results of Botes's polygraph examinations not be admitted for use at Botes's trial. Report and Recommendation (155), Objections (158), Order (185), Botes, No. 1:04-cr-568-3. That same day, Weintraub filed his motion to withdraw. Id., Motion to Withdraw (186). Accordingly, the Court finds that there is no genuine issue for trial as to whether Weintraub breached the representation agreement with Botes, which he did not, and Weintraub is due summary judgment on Botes's final, breach of contract, claim as well.

32

### III. Conclusion

For the foregoing reasons, Weintraub's motion for summary judgment [77] is **GRANTED**; Botes's motions to waive page limits [86] and for time [96] and Weintraub's motions for time [91] and to strike [95] are **GRANTED** *nunc pro tunc*; Botes's motions for discovery and sanctions [75] and for summary judgment [97] are **DENIED**; and this action is **DISMISSED**.

The Clerk is **DIRECTED** to remove the inadvertently docketed motion to strike [99] from the Court's submission list.

**IT IS SO ORDERED**, this ___11___ day of ___March___, 2010.


CHARLES A. MOYE, JR.
UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)